### GEORGE E. LEE CO. et al. v. FORT-IFIED MFG. CO.

(Circuit Court of Appeals, Eighth Circuit. October 16, 1922.)

No. 5853.

1. Patents ⊚⇒328—1,138,743, for melting device, void for prior public use.

The Froehlich patent, No. 1,138,743, for a melting device, consisting of a combination of mechanical elements for melting type metal and feeding the reservoir of a linotype machine, *held* void for prior sale by the patentee and public use of a device containing the essential features of that patented.

2. Patents ⊚⇒328—1,233,068, for melting device, not infringed.

The Lee patent, No. 1,233,068, for a melting device for melting type metal for linotype machines, as limited by the proceedings in the Patent Office, *held* not infringed.

3. Patents ⊚⇒168(2)—Limitations imposed by acquiescence in rulings of Patent Office.

An applicant, who acquiesces in rejection of his claim on references cited in the Patent Office and accepts a patent on an amended claim, is thereby estopped from maintaining that the later claim covers the combination shown in the references, and that it has the breadth of the rejected claim.

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Suit in equity by the George E. Lee Company and Albert A. Froehlich against the Fort-ified Manufacturing Company. Decree for defendant, and complainants appeal. Affirmed.

A. J. Hudson, of Cleveland, Ohio (George Y. Thorpe, of Kansas City, Mo., and Thurston & Kwis, of Cleveland, Ohio, on the brief), for appellants.

Arthur C. Brown, of Kansas City, Mo. (O. W. Pratt, Cyrus Crane, and Lathrop, Morrow, Fox & Moore, all of Kansas City, Mo., on the brief), for appellee.

Before SANBORN, STONE, and LEWIS, Circuit Judges.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

SANBORN, Circuit Judge. The plaintiffs below have appealed from a final decree of the District Court whereby it adjudged that claims 11, 12, 13, 14, 17, and 18 of the patent to Albert A. Froehlich, No. 1,138,743, applied for June 29, 1912, and issued May 11, 1915, for a combination of mechanical elements to maintain a constant supply of melted material, normally solid, in a reservoir; and claims 4 and 5 of the patent, No. 1,233,068, to George E. Lee, assignor to the George E. Lee Company, applied for August 5, 1914, and issued July 10, 1917, for an auxiliary melting device of a similar character, are invalid, and that claims 1, 2, 3, and 4 of the latter patent are not infringed by the defendant's device, consisting of the combination of the patent, No. 1,266,651, applied for October 4, 1916, and issued May 22, 1917, to George L. Ford, assignor to Fort-ified Manufacturing Company, for improvements in melting-pot feeders.

All the claims in controversy are for combinations of mechanical elements. The chief element in each of them is a long vertical feeding pot or feeder, in which cold metal is melted, and from which the molten metal is fed through an opening in or near its bottom into the reservoir of a linotype machine beneath the feeder, so that the molten metal in the reservoir is constantly maintained at a substantially uniform level. The heat to melt the cold metal is applied to the outer surface of the feeder by means of gas burners or electrical resistant coils of wire, and the application of the heat is automatically regulated by a device for applying or withdrawing it, actuated by a float on the surface of the molten metal in the reservoir, or other like device, in such a way as to keep that surface continuously at substantially the same level.

[1] The issues of the validity and patentability of the various claims of Froehlich's patent here in suit and of their infringement which require consideration, relate to the feeder or feeding pot, and it is unnecessary to set forth in detail the other mechanical elements of the combinations. In his patent Froehlich called this feeder a crucible, and in the various claims thereof here in suit he described it as a crucible supported above the reservoir, adapted to hold molten material in solid form, having a slanting bottom portion provided with an opening in the wall thereof, a housing surrounding the crucible, a guiding frame within the housing to guide an ingot of solid material, and with means, a burner beneath the crucible, to melt the solid metal in the crucible.

In the early history of the art it was the practice to heat the reservoir of a linotype machine and to melt the solid material therein. After the metal therein had become molten, the reservoir was supplied by dropping cold solid material into the molten metal in the reservoir. The reservoir was then called the melting pot of the linotype machine, and this name is still often used to describe it. During the time relevant to the issues presented here the melting has been done in the feeding pots, whence molten metal has been fed from openings in or near the bottoms thereof to the reservoirs of the linotype machines beneath them. The old metal pot of the linotype machines has become in practice a mere reservoir, and the feeding pot above it has become

in fact the melting pot. In the discussion here the former will be called the reservoir and the latter the melting pot.

A fair example of Froehlich's claims in suit is:

"12. The combination, with a reservoir adapted to hold melted material, of a crucible adapted to contain said material in solid form, having a slanting bottom portion and provided with an opening in the wall thereof, said crucible being supported above the reservoir, means for supporting an ingot of solid material in proper relation with respect to said crucible, and means for melting the metal in the crucible."

His other claims in suit described the means referred to in claim 12, such as a guiding frame within a housing to hold the ingot in proper relation to the crucible, a bracket adjacent to the reservoir on which the platform sustaining the crucible is pivotally supported, so that it may be swung aside to afford access to the reservoir, and a gas burner beneath the crucible, through which gas to heat the crucible and melt the metal therein may be conducted.

The court below held that the combinations described in these claims were not patentable to Froehlich under section 4886, Revised Statutes (section 9430, U. S. Comp. Stat. 1918), because they were in public use and on sale in this country more than two years prior to the application for his patent. The evidence proved, and in this court counsel for the plaintiffs concede, that at some time between 1902 and 1905 Froehlich made and sold to the firm of Smith-Grieves Typesetting Company, of Kansas City, four melting pots or feeders, which the purchasers have repaired from time to time and have continuously and successfully operated in connection with reservoirs for linotype machines for the purpose for which Froehlich stated in his patent he devised his combination, to wit:

"Of furnishing the reservoir fresh supplies, in melted condition of the substance being used as the material in the reservoir is depleted and to maintain the quantity of material within the reservoir substantially uniform."

A short time after the purchase of these melting pots or feeders by the Typesetting Company they bought of Froehlich four more, which they have successfully used for the same purpose. Froehlich's application for this patent was not made until June 29, 1912, more than six years after he had placed these eight melting pots in public use and on sale. There was testimony that he had offered for sale and sold other such melting pots at about the same time that he sold these.

Counsel for the plaintiff, however, contend that these old Froehlich machines do not anticipate the combinations of the claims under consideration, because the parts thereof which supported the metal to be melted were merely troughs open at both ends, and the gas flames which heated them played up around their sides, so that the molten metal was subjected to the flames and air to such an extent that an excessive quantity of dross was produced, that sometimes clogged the troughs and required frequent cleanings of the troughs and melting pots. Elimination of air prevents dross, and counsel for the plaintiffs argue that, because the patented combinations of Froehlich admitted less air and flame into contact with the melting metal than the old Froehlich machines did, the latter do not anticipate the former. The

casing or housing of the old machines was a vertical rectangular box, open at the top and provided at the bottom with a wide, flat, V-shaped trough slanting downward to a corner, in which there was an opening to permit the molten metal to flow into the reservoir beneath it. The sides of this trough were turned up and screwed or riveted onto the sides of the melting pot, but the ends were open. The cold metal to be melted rested on the flat V-shaped bottom, which was heated by flames from gas burners beneath it. Numerous small pigs of metal were originally used in the casing when the machines were first put into operation, but soon thereafter a long ingot of metal of a diameter convenient nearly to fill the casing or housing soon took the place of the pigs and has since been used. This casing was provided with guide members within it to direct and hold the cold metal in proper relation to the inclined trough-shaped bottom of it.

The machine of the patent has a tubular vertical casing or housing within the open lower end of which a cup of less diameter than the casing sits, the lower end of the casing extends a short distance below the top of the cup, and there is a narrow open space between the cup and the casing into which air and flame may enter. The lower end of the ingot to be melted rests on the slanting bottom of the cup, and is held in proper relation to it by the guide members in the casing. Heat is applied by means of gas burners beneath the slanting bottom of the cup. This brief comparison of the old Froehlich machines with the machines of the patented claims in suit leaves no doubt that the principle and mode of operation of the mechanical elements of the combinations of the claims in suit were completely described by and used in the old Froehlich machines. Conceding that the combinations of the patent admit less air and flames into contact with the melting and melted metal, produce less dross, and are on that account more economical and efficient, it required no exercise of the genuis of the inventor to restrict much more than the combinations of Froehlich's claims did the admission of air and flame into contact with the melting and melted metal. The other reasons urged why counsel claim that the combinations of the claims in suit constituted patentable improvements have received consideration, but they have proved even less persuasive than that which has been discussed, and the conclusion is that, when the state of the art and the old Froehlich machines, their sale and use, are given their just effect, there was no improvement upon those machines, or advance in the art which rose to the dignity of an invention, in any of the combinations of the claims of the Froehlich patent involved in this suit.

[2] The claims of patent No. 1,233,068, issued July 10, 1917, to George E. Lee, here in controversy, like those which have been considered, relate to combinations with other elements, here immaterial, of a melting pot primarily intended and adapted to be used to melt cold metal and supply molten metal to the reservoir of a linotype machine. By these claims the patentee sought to secure to himself the exclusive right to use and sell improvements on the melting pot of the Froehlich patent, consisting of making the lower portion of the melting pot conical, with an opening at the lower end thereof, and applying the heat directly and substantially only to the converging or conical

portion of the pot. The defendant made and sold melting pots of the same form and character, but it applied the heat to the cylindrical parts of them above the converging portions, as well as to the lower converging portions. It made this application of the heat by means of electrical resistance wire coils wound around the converging portion and an area of the cylindrical portion above the conical portion about equal to the area of the conical portion to which the resistance wires were applied. The court below was of the opinion that the defendant did not infringe these claims, because the patentee had estopped himself by his action in the Patent Office from maintaining any exclusive rights to the use or sale of such a melting pot, unless the heat was applied to it "directly and substantially only to the converging part thereof."

The patentee Lee filed his application for his patent on August 5, 1914, and his patent was issued on July 10, 1917. Meanwhile he was amending, withdrawing, and presenting various forms of claims to avoid prior patents and the objections and rejections of the Examiner in the Patent Office. His first claim and its history are typical of his other claims in suit here. In August, 1914, that first claim read in this way:

"1. In a device of the character described, the combination with a receptacle adapted to hold material in molten form of a melting cup supported above said receptacle, and adapted to receive the material to be melted in solid form, said cup being provided with an outlet opening in the bottom thereof, the wall in the bottom of said cup converging in all directions to the said opening, and means for heating said cup."

That claim, and his claims 2, 3, 4, and 5, were rejected by the Examiner on September 19, 1914. After repeated subsequent presentations and rejections of this and various other claims, it was again presented on September 18, 1916, in this form:

"1. In a device of the character described, the combination with a receptacle adapted to contain melted material, of a melting cup above said receptacle and adapted to receive material to be melted in solid form, the lower portion of said cup being formed with converging sides, and a heating device surrounding the converging portion of the melting cup and adapted to directly heat said portion of the melting cup."

This claim and claims 3 to 5 were rejected by the Examiner on September 29, 1916, on the patent to Casgrain, and the patentee then amended it, by erasing that part of the claim beginning with the word "surrounding" therein, and inserting in place of the words erased the words:

"Directly co-operating with the converging portion of the melting cup and applying heat to the cup directly and substantially only to the converging portion thereof."

The patentee at the same time made like amendments of claims 4 and 5, and the claims so amended were then patented. The reason for this amendment was that the patent to Casgrain, No. 535,671, issued March 12, 1905, portrayed a melting cup for casting metals, and more specifically for casting aluminum, having an upper cylindrical portion and a lower converging portion, and the application of the heat to melt the metal to both the cylindrical and the converging portions thereof. Prior to these last amendments the Examiner had repeatedly

cited this Casgrain patent as an anticipation, and at the time when Lee's counsel proposed this last amendment they wrote in their letter to the Commissioner of Patents in this way:

"In the applicant's device the metal is solid most of the time, and heat is applied so as to melt only the lower conical portion of the ingot within the melting cup. It is not desired to heat the entire cup, and the heating of any more than the conical portion of the cup is purely incidental and is not desirable."

A clearer and more positive renunciation and abandonment to the public of the patentee's claim to the exclusive right to the use and sale of a combination with the other elements of Lee's claim of a melting cup to which heat is applied directly and substantially to the cylindrical as well as to the converging portion thereof it would be difficult to make. There is substantial evidence that the defendant in its experiments first directly applied heat to the conical portion of the pot, and found that this did not work satisfactorily, and that thereafter it wound its electrical resistance wires around about as large a surface of the lower part of the cylindrical portion of its melting pot as about the surface of the conical portion thereof, and found that the operation of the melting pot thus treated was more satisfactory and successful.

[3] An applicant for a patent, who acquiesces in the rejection of his claim on references cited in the Patent Office and accepts a patent on 'an amended claim, is thereby estopped from maintaining that the later claim covers the combinations shown in the references, and that it has the breadth of the claim that was rejected. Roemer v. Peddie, 132 U. S. 313, 316, 317, 10 Sup. Ct. 98, 33 L. Ed. 382; Shepard v. Carrigan, 116 U. S. 593, 598, 6 Sup. Ct. 493, 29 L. Ed. 723; Knapp v. Morss, 150 U. S. 221, 224, 14 Sup. Ct. 81, 37 L. Ed. 1059. The way was not open to Lee after he accepted his amended claims, nor to the plaintiffs in this case, to maintain that the Examiner's decision that Casgrain's patent anticipated Lee's claim to a melting pot to the cylindrical as well as to the converging portion of which heat was directly or substantially applied, was erroneous. Their remedy for that error was by appeal therefrom. Having failed to appeal, they are bound by that decision, whether right or wrong. Shepard v. Carrigan, 116 U. S. 593, 598, 6 Sup. Ct. 493, 29 L. Ed. 723.

The state of the art when Lee's patent was applied for, the arguments and briefs of counsel, have received extended examination and deliberate consideration. The have, however, failed to convince that Lee and the plaintiffs were not estopped by the established rules of law and equity from maintaining that the defendant had infringed, the claims of Lee's patent here in suit. The Examiner decided that, unless those claims were expressly limited to a melting pot to which the heat was applied directly and substantially only to the converging portion thereof, they were anticipated by Casgrain's patent, and unpatentable. Lee acquiesced in that decision, and amended them so as thus to limit them. The defendant makes and uses a melting pot, to the cylindrical portion of which, above the converging portion, heat is directly and substantially applied to assist in melting the metal in the pot, and Lee and the plaintiffs are estopped from maintaining that such a melting pot so used infringes the claims in suit.

In view of this conclusion it is unnecessary to discuss or decide the questions of the validity and the patentability of the claims of the patent to Lee here in suit, and a discussion of them is omitted.

Let the decree below be affirmed, with costs.